## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATIS NAYMAN, Derivatively on Behalf of TALKSPACE, INC., | Case No.: |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CHARLES BERG, DOUGLAS L. BRAUNSTEIN, JEFFREY M. CROWE, OREN FRANK, RONI FRANK, MADHU PAWAR, EREZ SHACHAR, CURTIS WARFIELD, and JACQUELINE YEANEY, | |
| Defendants, | |
| and | |
| TALKSPACE, INC., | |
| Nominal Defendant. | |

Plaintiff Matis Nayman, by his undersigned attorneys, respectfully submits this Verified Stockholder Derivative Complaint.  Plaintiff makes these allegations upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, filings by Talkspace, Inc. ("Talkspace" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and other information regarding Talkspace.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

1

I.      **NATURE OF THE ACTION**

1.      This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Talkspace against certain current and former directors and officers of Talkspace for their breaches of fiduciary duty and violations of the federal securities laws, which resulted in material damage to the Company and irreparably harmed its reputation.

2.      Talkspace is a behavioral healthcare company that provides a digital HIPPA-compliant platform for patients, licensed therapists, psychologists, and psychiatrists to connect via text, video, and audio messaging and engage in live video sessions. Talkspace was founded by a married couple, Oren Frank, and Roni Frank, in 2012.

3.      In June 2021, Talkspace became a publicly traded company as a result of a merger (the "Merger") with a special purpose acquisition company ("SPAC") Hudson Executive Investment Corp. ("HEIC").

4.      In numerous public filings, earnings calls, and presentations in the months preceding and following the Merger, the Company represented that Talkspace was poised for tremendous growth based on its financial condition, business prospects, and qualified and competent management. Shortly before the consummation of the Merger, HEIC identified a material weakness in its internal controls, requiring HEIC to restate several financial statements. Even though Talkspace acknowledged in its post-Merger public filings that material weaknesses in its internal controls had not been fully addressed and dismissed its independent auditor, the Company represented that its internal controls over financial reporting were adequate. Based on these assurances, the Company released robust financial guidance for 2021, including revenue guidance of $125 million, with projections of more than 60% growth for the year.

5.    However, in November 2021, the Company reported disappointing third-quarter numbers based on an increase in the allowance for credit losses on account receivables and falling well short of expectations for revenue for the quarter, resulting in a later disclosed year-end revenue of only $114 million, falling short of the revenue guidance by more than fifteen percent.

6.    Following the disappointing third-quarter results, the Company disclosed the abrupt departure of the Franks, closely followed by the resignation of its President and Chief Operating Officer ("COO"), Mark Hirschhorn ("Hirschhorn").

7.    Based on the dismal financial results and the departure of key officers, the Company's stock dropped precipitously, falling more than 36% in one week.

8.    Securities class action lawsuits were soon filed by aggrieved investors against the Company, several of its officers and directors, and several other entities connected with the Merger. As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself and its officers and/or directors.

9.    The Individual Defendants owed and owe Talkspace and its stockholders the highest fiduciary duties. Those duties required that they investigate and act when presented with red flags demonstrating a lack of internal controls and inferior leadership. Despite the identified ongoing material weaknesses in internal controls and the knowledge that the Company had inferior leadership, the Individual Defendants chose to ignore the red flags and failed to take action to prevent or mitigate the damage to the Company.

10.    As a result of the Individual Defendants' breaches of fiduciary duty, Talkspace has sustained substantial damages and irreparable injury to its reputation.  Through this action, Plaintiff seeks to recover for the Company its damages and remediate the control weaknesses that plague Talkspace.

11.     Plaintiff did not make a demand prior to bringing this action because it would be futile.  The Company's directors are neither disinterested nor independent.  In the absence of this action, Talkspace will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.     VENUE AND JURISDICTION

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa, because Plaintiff's claims raise a federal question under Section 20(a) of the Exchange Act, 15 U.S.C. §§ 78t(a) and 78t-1(a).

13.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.      This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

4

III.    **PARTIES**

  **A. Plaintiff**

17.    Plaintiff Matis Nayman acquired 14,000 shares of Talkspace common stock on July 14, 2021 and has held Talkspace common stock continuously since that time. As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

  **B. Defendants**

  **1.    Nominal Defendant Talkspace, Inc.**

18.    Talkspace is a corporation duly incorporated under the laws of the State of Delaware with its principal executive offices located at New York, New York.  Talkspace's common stock trades on the Nasdaq Stock Market ("Nasdaq") under the ticker symbol "TALK."

  **2.    Individual Defendants**

  **a.    Defendant Braunstein**

19.    Defendant Douglas L. Braunstein ("Braunstein") is a Talkspace director, Chairman of the Board since the closing of the Merger and has served as the Company's Interim Chief Executive Officer ("CEO") since November 2021.  As of February 25, 2022, Braunstein owns 23,525,046 Talkspace shares.[1]   Braunstein is Chairman and President of Hudson Executive

---

[1]    According to the 2021 10-K, this amount consists of (i) 11,340,600 shares of common stock and 7,640,000 shares of common stock issuable upon the exercise of warrants held by HEC Master Fund LP, (ii) 2,274,446 shares of common stock owned jointly among Braunstein and Talkspace's Chief Marketing Officer, non-party Samara Braunstein, who is Defendant Braunstein's spouse, including through a trust, and (iii) 2,270,000 shares of common stock beneficially owned jointly among Braunstein and Samara Braunstein through the ownership of warrants exercisable within 60 days of the date of February 15, 2022.

Samara Braunstein has served as Talkspace's Chief Marketing Officer since December 2020. As of February 25, 2022, Samara Braunstein beneficially owned 4,825,627 Talkspace shares. According to the Company's 2021 10-K, Samara Braunstein received over $6 million in compensation in 2021:

Investment Corp. II and III. HEC Sponsor LLC ("HEC Sponsor") served as the blank check sponsor of Talkspace. Braunstein is the Founder and Managing Partner of Hudson Executive Capital LP ("Hudson Executive Capital"), an affiliate of the HEC Sponsor, since 2015. Braunstein was also a member of the HEC Sponsor, a beneficial owner of shares held by the HEC Sponsor, and shared voting and investment discretion with respect to the common stock held by the HEC Sponsor. According to the Company's Annual Report on Form 10-K filed with the SEC on February 25, 2022 (the "2021 10-K"), Defendant Braunstein received the following compensation in 2021:

| Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total |
|---|---|---|---|---|---|
| 21,000 | N/A | 55,078 | 322,550 | N/A | **$398,628** |

### b.   Defendant Berg

20.     Defendant Charles Berg ("Berg") is a Talkspace director since the completion of the Merger. Since January 2022, Berg has been the President of U.S. Government Business and Senior Advisor Leading Medicare Advantage and Individual & Family Plans at Cigna Corporation ("Cigna"). According to the 2021 10-K, Defendant Berg received the following compensation in 2021:

| Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) | Total |
|---|---|---|---|
| 21,000 | 55,078 | 322,550 | **$398,628** |

| Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total |
|---|---|---|---|---|---|
| 313,864 | 165,000 | 443,025 | 5,333,019 | N/A | **$6,254,908** |

### c. Defendant Crowe

21.     Defendant Jeffrey M. Crowe ("Crowe") is a Talkspace director since 2016 and a member of the Audit Committee and Compensation Committee.  He has been employed by Norwest Venture Partners ("Norwest") since January 2002.  He was CEO-in-residence with Norwest from January 2002 to December 2003, joined the firm as a Venture Partner in January 2004, became a General Partner in January 2005 and has served as Managing Partner of the firm since January 2013.  As of February 25, 2022, Crowe beneficially owned 14,702,972 Talkspace shares with a total voting power of 9.6%.[2]  According to the 2021 10-K, Defendant Crowe received the following compensation in 2021:

| Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) | Total |
|---|---|---|---|
| 21,000 | 55,078 | 109,114 | **$185,192** |

### d. Defendant Pawar

22.     Defendant Madhu Pawar ("Pawar") is a Talkspace director since the consummation of the Merger and a member of the  Audit Committee.  According to the Company's 2021 10-K, Defendant Pawar received the following compensation in 2021:

| Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) | Total |
|---|---|---|---|
| 21,000 | 55,078 | 322,550 | **$398,628** |

---

[2]     According to the 2021 10-K, this amount consists of shares of common stock held by Norwest Venture Partners XIII, LP. Each of Promod Haque, Jeffrey Crowe and Jon Kossow, as Co-Chief Executive Officers of NVP Associates, LLC and members of the general partner, may be deemed to share voting and dispositive power over the shares held by Norwest Venture Partners XIII, LP.

7

### e.   Defendant Shachar

23.   Defendant Erez Shachar ("Shachar") is a Talkspace director since 2017  and  is Chair of its Compensation Committee and a member of the Nominating and Corporate Governance Committee.  Defendant Shachar is the co-founder and managing partner of Qumra Capital Management Ltd. ("Qumra Capital"), a venture capital firm founded in 2014.  As of February 25, 2022, Shachar beneficially owned 8,753,437 Talkspace shares, with a total voting power of 5.6%.[3] According to the Company's 2021 10-K, Defendant Shachar received the following compensation in 2021:

| Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) | Total |
|---|---|---|---|
| 26,000 | 55,078 | 109,114 | **$190,192** |

### f.   Defendant Warfield

24.   Defendant Curtis Warfield ("Warfield") is a Talkspace director since the completion of the Merger and is Chair of the Audit Committee and a Member of the Compensation Committee.  According to the Company's 2021 10-K, Defendant Warfield received the following compensation in 2021:

| Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) | Total |
|---|---|---|---|
| 31,500 | 55,078 | 322,550 | **$409,128** |

### g.   Defendant Yeaney

25.   Defendant Jacqueline Yeaney ("Yeaney") is a Talkspace director since the completion of the Merger and is Chair of the Nominating and Corporate Governance Committee

---

[3]   According to the 2021 10-K, this amount consists of shares of common stock held by Qumra Capital II, L.P ("Qumra II"). Qumra Capital GP II, L.P. ("Qumra GP II") is the general partner of Qumra II and Qumra Capital Israel I Ltd. ("Qumra Capital Ltd.") is the general partner of Qumra GP II.  Boaz Dinte and Erez Shachar serve as the managing partners of Qumra Capital Ltd.

and a member of its Audit Committee.  According to the Company's 2021 10-K, Defendant

Yeaney received the following compensation in 2021:

| Fees Earned or Paid in Cash ($) | Stock Awards ($) | Option Awards ($) | Total |
|---|---|---|---|
| 21,000 | 55,078 | 322,550 | **$398,628** |

### h.    Oren Frank

26.    Defendant Oren Frank is the co-founder of Talkspace, its former CEO,  and served

on its Board until his unexpected departure from the Company on November 15, 2021.  As of

February 25, 2022, Oren Frank beneficially owned 5,482,532 Talkspace shares.[4]  According to the

Company's 2021 10-K, Oren Frank received the following compensation in 2021:

| Salary ($) | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total |
|---|---|---|---|---|
| 255,930 | 1,550,588 | 8,820,694 | 1,581,368 | **$12,208,580** |

### i.    Roni Frank

27.    Defendant Roni Frank is the co-founder of Talkspace, served as Talkspace's Head

of Clinical Services, and as a director on the Board until her unexpected departure on November

15, 2001.  As of February 25, 2022, she beneficially owned 5,211,832 Talkspace shares.[5]

According to the Company's 2021 10-K, Roni Frank received the following compensation in 2021:

| Salary | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total |
|---|---|---|---|---|
| 228,027 | 443,025 | 4,586,817 | 1,433,317 | **$6,691,186** |

---

[4]    Consists of (i) 1,267,726 shares of common stock held directly by Oren Frank, (ii) 474,719 shares of common stock held by the Oren Frank 2018 Trust and (iii) 3,740,087 shares of common stock issuable upon the exercise of options or vesting of restricted stock units, exercisable as of or within 60 days of February 15, 2022.

[5]    Consists of (i) 1,267,726 shares of common stock held directly by Roni Frank, (ii) 474,719 shares of common stock held by the Roni Frank 2018 Trust, and (iii) 3,469,387 shares of common stock issuable upon the exercise of options or vesting of restricted stock units, exercisable as of or within 60 days of February 15, 2022.

## IV.     THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

28.     By reason of their positions as officers and directors of Talkspace and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe Talkspace and its shareholders fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Talkspace in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Talkspace and its shareholders to benefit all shareholders equally and not in furtherance of their interests or benefit.

29.     Further, as required by the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Individual Defendants were and are required to refrain from engaging in misconduct, and to claw back compensation from officers engaged in knowing misconduct, including violations of applicable law and NASDAQ rules.  The Individual Defendants were and are obligated to file full, accurate, and timely reports and public communications with the SEC.

30.     To discharge their duties, the officers and directors of Talkspace were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial and corporate affairs and assets of the Company.

31.     At all times relevant hereto, the Individual Defendants were the agents of each other and Talkspace and were always acting within the course and scope of such agency.

32.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Talkspace.

### A.     Additional Duties Under The Code Of Business Conduct And Ethics

33.     Talkspace's Code of Business Conduct and Ethics (the "Code of Conduct") was adopted by the Board and contain guidelines for conducting the business of Talkspace "consistent

with the highest standards of business ethics." The Code of Conduct applies to all directors, officers, and employees.

34.     Significantly, the Code of Conduct provides that "any employee or director who violates this Code will be subject to appropriate discipline, which may include, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors of the Company . . . ."

35.     Among the duties imposed by the Code of Conduct are:

- Maintaining complete, accurate, and reliable Company records;

- Maintaining full, fair, accurate, timely and understandable financial disclosures in reports, documents filed with the SEC and in all public communications; and

- Complying with all laws, rules, and regulations, including, among others, . . . insider trading, . . . false or misleading financial information, or misuse of corporate assets.

**B.     Additional Duties Under The Corporate Governance Guidelines**

36.     In addition to the Code of Conduct, Talkspace has "Corporate Governance Guidelines" that were adopted by the Board to assist it in exercising its responsibilities and serving the best interests of the Company. The Corporate Governance Guidelines set forth "Director Responsibilities," including:

- exercising their business judgment in good faith;

- acting in what they reasonably believe to be the best interest of all stockholders;

- becoming and remaining well-informed about the Company's business and operations and general business and economic trends affecting the Company; and

- ensuring that the business of the Company is conducted so as to further the long-term interests of its stockholders.

### C.    Additional Duties Of The Members Of The Audit Committee

37.    The members of the Company's Audit Committee (Chairperson Warfield, Crowe, Pawar, and Yeaney) have additional duties outlined in the Audit Committee Charter,  which states that a significant purpose of the Audit Committee "is to oversee the accounting and financial processes of Talkspace, Inc. . . . and the audits of the financial statements of the Company."

38.    The Audit Committee Charter provides that "[t]he Committee must meet at least once during each fiscal quarter. The Committee must meet separately, periodically, with management, with the internal auditor (if any) and with the independent auditor."

39.    Other Audit Committee Member duties and responsibilities include:

- discussing with the independent auditor any audit problems or difficulties and management's response;

- reviewing and discussing the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

- providing the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements;

- reviewing and discussing the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

- discussing the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies;

- discussing the Company's policies with respect to risk assessment and risk management; and

- reporting regularly to the Board regarding the activities of the Committee.

### D.    Additional Duties Of The Members Of The Nominating And Corporate Governance Committee

40.    The members of the Company's Nominating and Corporate Governance Committee (Chairperson Yeaney and Shachar) have additional duties outlined in the Nominating

and Corporate Governance Committee Charter, including requirements that its members, "develop and recommend to the Board the Corporate Governance Guidelines" and "review and reassess the adequacy of such Corporate Governance Guidelines and recommend any proposed changes to the Board for approval."

### E.     Additional Duties Of The Members Of The Compensation Committee

41.     The members of the Company's Compensation Committee (Chairperson Shachar, Crowe, and Warfield) have additional duties outlined in the Compensation Committee Charter, including requirements that its members:

- Reviewing and making recommendations to the Board regarding the compensation of the Chief Executive Officer and other executive officers;

- Reviewing and making recommendations to the Board regarding director compensation;

- Reviewing and approving or making recommendations to the Board regarding the Company's incentive compensation and equity-based plans and arrangements;

- Reviewing and discussing the Compensation Discussion and Analysis required to be included in the Company's Proxy Statement and Annual Report on Form 10-K or annual proxy;

- Producing the annual Compensation Committee report to be included in the proxy, to the extent required; and

- Reporting regularly to the Board regarding the activities of the Committee.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

42.     According to the 2021 10-K, Talkspace was founded in 2012 by Oren Frank and Roni Frank.[6] Talkspace is an online and mobile therapy company. Its signature psychotherapy

---

[6]     Mary Ann Azevedo, *Digital Therapy Startup Talkspace Raises $50M in Revolution-Led Series D, Crunchbase News*, May 29, 2019, https://news.crunchbase.com/news/digital-therapy-startup-talkspace-raises-50m-in-revolution-led-series-d/

product connects individual clients with a network of thousands of licensed therapists through an easy-to-use and HIPAA-compliant web and mobile platform. Clients can send their dedicated therapists text, video, and voice messages anytime, from anywhere, and engage in live video sessions. Talkspace also provides psychiatry services, including prescription fulfillment, adolescent therapy, and couples counseling.

43.     Talkspace's platform serves two different business channels: B2C (business-to-consumer), comprised of individual consumers who subscribe directly on Talkspace's platform; and B2B (business-to-business), comprised of large enterprise clients and large health plans and employee assistance programs (collectively "health plan clients") who offer their employees and insured members access to Talkspace's platform for free or at in-network reimbursement rates.

44.     On May 12, 2015, three years after its founding, the Company announced a Series A funding that raised $9.5 million.[7]

45.     In June 2016, the Company issued a press release announcing a Series B funding that raised an additional $15 million in a round led by Norwest Venture Partners:

> Talkspace, the global leader in online therapy, announced today it has raised $15 million in Series B funding in a round led by Norwest Venture Partners, with participation from existing investors, Spark Capital, Soft Bank, Metamorphic Ventures and TheTime. Additionally, the company is welcoming Dr. Linda Sacco as its Vice President of Behavioral Health Service, and Jeff Crowe, Managing Partner at Norwest Venture Partners, to Talkspace's Board of Directors.[8]

---

[7]     Teresa Novellino, *Talkspace Raises $9.5M to Let Users Text Their Therapists New York Business Journal*, May 13, 2015, https://www.bizjournals.com/newyork/news/2015/05/13/therapy-via-text-startup-raises-9-5-m-series-a.html.

[8]     Talkspace, June 14, 2016,  https://www.prnewswire.com/news-releases/talkspace-raises-15-million-in-series-b-funding-to-continue-growing-the-largest-online-therapy-marketplace-300284210.html.

46.     Subsequently, on September 4, 2017, Qumra Capital, led by Defendant Shachar, announced on its website that it led a series C funding that raised an initial $31 million with participation from existing investors, including Norwest Venture Partners.[9]

47.     In a May 29, 2019 press release, Talkspace announced a Series D offering with $50 million in new financing. Previous investors, Norwest Ventures Partners, Qumra Capital, Spark Capital, and Compound Ventures, among others, joined the Series D investing round.  The Series D funding increased Talkspace's total funding to $110 million since its inception in 2012.

**B.      Talkspace Goes Public Through A Merger**

48.     Hudson Executive Investment Corp. ("HEIC") is a special purpose acquisition company ("SPAC"),[10] incorporated in Delaware, which raised $414 million in a June 11, 2020, initial public offering ("IPO") and began trading on the Nasdaq under the symbol "HIIU."

49.     On January 13, 2021, Talkspace filed with the SEC a Current Report on Form 8-K attaching a joint press release issued by HEIC and Groop Internet Platform, Inc. (d/b/a Talkspace) announcing that Talkspace would become a publicly traded company through a merger with HEIC.

50.     On February 2, 2021, HEIC filed with the SEC the Form S-4 registration statement and draft proxy statement for the Merger.  After several amendments, the registration statement and proxy statement were declared effective on May 28, 2021 (the "Merger Proxy Statement").  Defendant Braunstein signed the Merger Proxy Statement on behalf of the Board as President, Chair, and Director of HEIC.

---

[9]     Qumra Capital, Sept. 4, 2017, https://qumracapital.com/news/online-therapy-company-talkspace-has-closed-31-million-in-new-financing/.

[10]    A special purpose acquisition company does not initially have any operations or business of its own.  Instead, it raises money from investors in an initial public offering and then uses the proceeds to acquire a business or operational assets, usually from a private company that does not publicly report financial or operating results.

51.     The Merger Proxy Statement solicited stockholders to, among other things, approve the Merger and consider and vote upon a proposal to divide the Board into three classes to serve staggered terms.

52.     HEIC proposed Defendants Shachar, Crowe, and Pawar to serve as the Class I directors (until 2022); Defendants Yeaney, Warfield, and Berg to serve as Class II directors (until 2023); and Defendants Braunstein, Oren Frank, and Roni Frank to serve as Class III directors (until 2024).

53.     The Merger Proxy Statement touted the benefits of the Merger focusing on several factors such as the attractive valuation of Talkspace and reasonableness of the aggregate consideration which the HEIC board determined after a "review of the financial data provided to [HEIC], including Talkspace's historical financial statements and certain unaudited prospective financial information, as well as [HEIC's] due diligence review of the Talkspace business and the views of [HEIC's] financial and other advisors."

54.     The Merger Proxy Statement noted the HEIC's board "extensive due diligence, along with their familiarity with Talkspace's business from prior commercial experiences," emphasizing that "the [HEIC] Board and [HEIC] management had knowledge of, and were familiar with, Talkspace's business, financial condition, results of operations and future growth prospects."

55.     The HEIC board focused on "Talkspace's growing customer base," with forecasts "that the number of total business to customer subscribers will increase from 19,851 in 2019, to 31,214 in 2020, 46,259 in 2021, 71,001 in 2022 and 85,829 in 2023."

56.     The Merger Proxy Statement disclosed that the HEIC board also considered:

> [T]he fact that Talkspace (i) is of a size relevant to the public marketplace, (ii) has a strong existing management team, (iii) **has a significant total addressable market and growth expansion opportunities,** (iv) provides an opportunity for operational improvement and (v) would benefit from the consummation of the Transactions as a result of becoming a public company and deleveraging, which the [HEIC] Board believed would improve Talkspace's ability to grow, including through acquisitions.[11]

57.     The Merger Proxy Statement included unaudited pro forma condensed financial information. Included within that information, the Proxy listed, as an asset for Talkspace, accounts receivable of $7,580,000 as of March 31, 2021.

58.     The Merger Proxy Statement failed to disclose the fact that Talkspace was suffering from increased online advertising and customer acquisition costs, lower conversion rates, and a looming issue of lackluster demand in its B2C business.

59.     According to the Merger Proxy Statement, the HEIC board did not consider the hiring of Samara Braunstein, the wife of Defendant Braunstein, as an executive officer to pose any conflicts despite Defendant Braunstein's tenure on the Board:

> [B]eginning in September 2020, Samara Braunstein, the spouse of Douglas Braunstein, was engaged by Talkspace as a consultant, and on December 31, 2020, Talkspace entered into an employment letter agreement with Samara Braunstein to serve as its Chief Marketing Officer. The HEIC Board did not consider the hiring of Samara Braunstein to be a material conflict of interest.

60.     On June 17, 2021, HEIC shareholders voted to approve the Merger at a special meeting.  Following the consummation of the Merger on June 22, 2021, HEIC changed its name to "Talkspace, Inc.," and the proposed directors were installed on the Board.

---

[11]     All emphasis herein is added unless otherwise stated.

### C.   The Individual Defendants Knew About The Material Risks Regarding Talkspace's Core Operations

61.     The Merger Proxy Statement disclosed the risks in connection to retaining Talkspace's customer base and attracting new customers:[12]

Our business and the markets we operate in are new and rapidly evolving which make it difficult to evaluate and assess the success of our business to date, our future prospects and the risks and challenges that we may encounter. These risks and challenges include our ability to:

- attract new clients and members to our platform and position our platform as a convenient and accepted way to access therapy and psychiatry;

- retain our clients and members and encourage them to continue to utilize our platform and services;

- attract new and existing clients and members to rapidly adopt new offerings on our platform;

- increase the number of clients and members that use our subscription offerings or the number of subscription programs that we manage;

- retain our clients and members that subscribe to our subscription offerings; and

- gain market acceptance of our services and products with clients and members and maintain and expand such relationships.

62.     The Merger Proxy Statement disclosed the risks of failing to maintain subscription levels:

If growth in the number of clients and members or providers on our platform decreases, or the number of products or services that we are able to sell to our clients and members decreases, due to legal, economic or business developments, our business, financial condition and results of operations will be harmed.

We currently generate most of our revenues from members who purchase subscription access to our platform. These subscriptions generally have stated initial terms of one-to-six months. We also generate revenues from our enterprise clients, which contracts generally have stated initial terms of one year, unless earlier terminated subject to notice and other requirements. Most of our clients and

---

[12]     The risk factors contained in the Merger Proxy Statement were incorporated by reference into the Current Report on Form 8-K that Talkspace filed with the SEC on June 23, 2021.

members have no obligation to renew their subscriptions for our services after the initial term expires. In addition, our clients may negotiate terms less advantageous to us upon renewal, which may reduce our revenue from these clients.

***

If our clients and members fail to renew their contracts, renew their contracts upon less favorable terms or at lower fee levels or fail to purchase new products and services from us, our revenue may decline or our future revenue growth may be constrained.  (Emphasis in original).

63.    The Merger Proxy Statement cautioned that Talkspace's growth was dependent on

its marketing efforts and on customer conversion costs:

Our future growth and profitability of our business will depend in large part upon the effectiveness and efficiency of our marketing efforts, and our ability to develop brand awareness cost-effectively.  (Emphasis in original).

Our business success depends on our ability to attract and retain clients and members, which significantly depends on our marketing practices….[I]ncluding our ability to:

- create greater awareness of our brand;

- identify the most effective and efficient levels of spending in each market, media and specific media vehicle;

- effectively manage marketing costs (including creative and media) to maintain acceptable consumer acquisition costs;

- convert consumer inquiries into clients and members.

64.    The Merger Proxy Statement disclosed the risks of losing members of Talkspace's

management team:

We depend on our senior management team, and the loss of one or more of our executive officers or key employees or an inability to attract and retain highly skilled, very large and diverse employees could adversely affect our business.

***Our success depends largely upon the continued services of our key members of senior management***….The replacement of one or more of our executive officers or other key employees would likely involve significant time and costs and may significantly delay or prevent the achievement of our business objectives.

***

Our ability to successfully effect the business combination and to be successful thereafter will be dependent upon the efforts of certain key personnel, including the key personnel of Talkspace whom we expect to stay with the post-combination business following the business combination. The loss of key personnel could negatively impact the operations and profitability of our post-combination business and its financial condition could suffer as a result.

65.    On August 9, 2021, Talkspace filed with the SEC a Quarterly Report on Form 10-Q for the second quarter of 2021 (the "2Q21 10-Q"), which disclosed material risks, including those relating to the Company's dependence on its management team.

66.    The Company reiterated the risks associated with retaining its customer base and acquiring new clients:

*If growth in the number of clients and members or providers on our platform decreases, or the number of products or services that we are able to sell to our clients and members decreases, due to legal, economic or business developments, our business, financial condition and results of operations will be harmed.*

We currently generate most of our revenues from members who purchase subscription access to our platform….Most of our clients and members have no obligation to renew their subscriptions for our services after the initial term expires….If our clients and members fail to renew their contracts, renew their contracts upon less favorable terms or at lower fee levels or fail to purchase new products and services from us, our revenue may decline or our future revenue growth may be constrained. (Emphasis in original).

67.    In the 2Q21 10-Q, Talkspace further disclosed the risks relating to its operations as a public company, including the need to meet all regulatory and legal reporting requirements:

*We will incur significantly increased costs and devote substantial management time as a result of operating as a public company.*

As a public company, we will incur significant legal, accounting and other expenses that we do not incur as a private company. For example, we will be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and will be required to comply with the applicable requirements of the Sarbanes-Oxley Act and the Dodd-Frank Wall Street Reform and Consumer Protection Act, as well as rules and regulations of the SEC and Nasdaq, including the establishment and maintenance of effective disclosure and financial controls, changes in corporate governance practices and required filing of annual, quarterly and current reports with respect to our business and results of operations. *Any*

20

*failure to develop or maintain effective controls or any difficulties encountered in their implementation or improvement could harm our results of operations or cause us to fail to meet our reporting obligations.*

68.    The 2Q21 10-Q discussed the need to hire further accounting and financial staff to

meet those requirements:

> We are in the process of hiring additional accounting personnel and, ***as a public company, may need to hire additional accounting and financial staff with appropriate public company experience and technical accounting knowledge and may need to establish an internal audit function.***

69.    The 2Q21 10-Q disclosed the risk of failing to maintain proper internal controls

over financial reporting:

> ***If we fail to establish and maintain proper and effective internal control over financial reporting, as a public company, our ability to produce accurate and timely financial statements could be impaired, investors may lose confidence in our financial reporting and the trading price of our common stock may decline.*** (Emphasis in original).

70.    The 2Q21 10-Q contained the annual report by management on the effectiveness of

the internal controls and stressed the need to disclose any changes in internal controls on a quarterly

basis:

> Pursuant to Section 404 of the Sarbanes-Oxley Act, we are required to provide a report by management on, among other things, the effectiveness of our internal control over financial reporting. This assessment will need to include disclosure of any material weaknesses…in our internal control over financial reporting. We will be required to disclose changes made in our internal controls and procedures on a quarterly basis. As a private company, we have not previously been required to conduct an internal control evaluation and assessment.

71.    Talkspace admitted that "[t]he rules governing the standards that must be met for

management to assess internal control over financial reporting are complex and require significant

documentation, testing and possible remediation."  Therefore, to "comply with the Sarbanes-Oxley

Act, the requirements of being a reporting company under the Exchange Act and any complex

accounting rules in the future, we may need to upgrade our information technology systems,

implement additional financial and management controls, reporting systems and procedures and hire additional accounting and finance staff."

72.     Talkspace acknowledged that if the Company would be unable to "hire the additional accounting and finance staff necessary to comply with [the various] requirements, we may need to retain additional outside consultants," and if the internal controls remain ineffective, "investors may lose confidence in our financial reporting, which could negatively impact the price of our securities."

### D.     Talkspace Touts Its Management Team And Business Prospects

73.     In connection with the Merger, in the press release on January 13, 2021, Talkspace touted the expertise of its leadership.  Among other things, the press release stated: "***Co-founders Roni and Oren Frank will continue to lead Talkspace, along with President, COO and CFO Mark Hirschhorn and the rest of the company's highly experienced leadership team.***"

74.     In the press release, Talkspace also touted its estimated net revenue and robust user growth:

> Talkspace has seen robust user growth, with approximately 46,000 active members, and more than 39 million lives covered by employer or healthcare insurance agreements. The company is differentiated in the market due to its focused offerings as well as its highly-rated app and purpose-built technology designed to enhance access and improve outcomes.
>
> ***
>
> For 2021, Talkspace's estimated net revenue is $125 million, up approximately 69% from 2020 estimated net revenue.

75.     Similarly, a January 2021 presentation that was prepared for HEIC and Groop Internet Platform, Inc. (d/b/a Talkspace) in connection with the proposed Merger touted Talkspace's "***deep, highly experienced leadership team***."

76.     The Merger Proxy Statement also painted a rosy picture of Talkspace's business:

22

Talkspace revenues were $76.2 million and $38.2 million for the years ended December 31, 2020 and 2019, respectively, representing a period-over-period increase of 99.6%, and $27.2 million and $11.1 million for the three months ended March 31, 2021 and 2020, respectively, representing a period-over-period increase of 144.2%.

77.     On March 12, 2021, Talkspace filed with the SEC an "Analyst Day Presentation," jointly prepared by HEIC and Groop Internet Platform, Inc. (d/b/a Talkspace) on Form 425.  The presentation touted Defendant Braunstein's role as Founder/Managing Partner of Hudson Executive Capital, as well as the fact that he, along with Hudson Executive Capital and Douglas G. Bergeron,[13] who was CEO and a director of HEIC at the time of the Merger, co-sponsored HEIC. During the presentation, Samara Braunstein addressed the Company's B2C business (comprised of individual subscribers).  The presentation noted the growth in "B2C Active Members," using a graph to compare the results of 2019 to February 28, 2021.[14]

78.     In the 2Q21 10-Q, Talkspace's management represented that despite identified material weaknesses in the Company's disclosure controls and procedures, "the financial statements included in this [Quarterly Report] present fairly in all material respects our financial position, results of operations and cash flows for the periods presented."

79.     On August 9, 2021, Talkspace filed with the SEC a Current Report on Form 8-K attaching a press release issued by Talkspace on that date announcing the Company's financial results for the second quarter of 2021.

80.     That same day, Talkspace held a conference call with financial analysts and investors to discuss the Company's second quarter financial results. On the call, Defendant Oren

---

[13]     Bergeron is named as a defendant in the pending consolidated securities class action.

[14]     The growth from approximately 20,000 active members to approximately 32,000 active members is misleadingly shown on a bar graph that is not at scale, suggesting a significantly higher growth rate than was actually the case.

Frank revealed some of the issues relating to increased customer acquisition costs (sometimes referred to as "CAC") due to rising digital advertising costs while downplaying their impact. For example, Frank stated:

> While our B2C revenue grew substantially, we and many of our peers are experiencing elevated customer acquisition cost, due mainly to a material increase in the cost of digital advertising.
>
> As a result of this environment, we're taking a number of steps which we believe further strengthens our business: First, we increased our advertising budget, which . . . we believe will ultimately increase members retention, engagement and satisfaction.

81.     President and COO, Mark Hirschhorn admitted to a material increase in customer acquisition costs since the beginning of the year but blamed "the current environment" which made it difficult to predict when the costs would normalize:

> As Oren mentioned, CAC has been meaningfully elevated since the beginning of the year relative to prior periods. The majority of the excess losses in the quarter relative to initial expectations can be attributed to this increase in customer acquisition cost. While advertising costs have dramatically increased during the first-half of this year, the current environment makes it more difficult to predict when customer acquisition costs will ultimately normalize. As such we will not be providing any update to guidance on EBITDA for the remainder of the year.

82.     Likewise, in response to an analyst question concerning the fact that the number of active members in the B2C channel was down sequentially from the first quarter of 2021 (and thus below expectations), Hirschhorn reassured that the Company was doing what it could to "maintain our competitive advantage" and that costs would "ultimately stabilize":

> We were very deliberate this quarter, and we continue to really focus on the fact that there's really punitive pricing in the market today, there is a tremendous price disparity in customer acquisition costs this year, as composed – as compared to where we were in the second quarter of 2020 . . . And we are spending what we believe is appropriate to maintain our competitive advantage in our leading brand….
>
> ***I think the – it's unlikely that we are going to see a dramatic shift downward in the next quarter or two, but we do believe that CAC will stabilize, because these***

*are, quite frankly, levels – I'd say, elevated levels that we don't believe are*
*sustainable, nor have we ever seen increases like this since this – really since this,*
*I'd say, past two to three years has and we've been tracking this clearly over the*
*last five years.*

83.     During the conference call, Defendant Oren Frank represented that the Company

was on track to meet its revenue guidance:

> Our $31 million in net revenue for the second quarter was a quarterly record for the
> company and represents 73% year-over-year growth. B2C net revenue for the
> second quarter was $21 million, up 36% year-over-year, and up 14% sequentially.
> Of particular note, our B2B revenue grew 320% year-over-year to $10 million. And
> we have a robust pipeline of B2B clients in revenue opportunities. As a result, *we*
> *are on track to meet our revenue guidance of $125 million,* growing our revenue
> by 64% for the fiscal year of 2021.

**E.     Talkspace Misses Its Revenue Guidance**

84.     On November 15, 2021, Talkspace filed with the SEC a Current Report on Form

8-K attaching a press release issued by Talkspace on that date announcing the Company's financial

results for the third quarter of 2021.

85.     The press release reported that "overall financial results for the third quarter were

disappointing" and that "Q3 Net Revenue . . . came in below expectations due to a lower number

of acquired customers in the direct-to-consumer business and an adjustment to reserves, which

was only partially offset by growth in the B2B Gross Revenue."

86.     The press release tied the below expectations revenue to an increase in the

allowance for credit losses on account receivables:

> In the third quarter we increased the allowance for credit losses on receivables by
> $3.4 million, of which $2.8 million related to prior quarters. Excluding the impact
> of this one-time non-cash adjustment, consolidated Revenue would have been
> $29.2 million, up 37% year-over-year.
>
> Direct-to-consumer Revenue was $18.6 million, a 10% year-over-year increase in
> the third quarter. The slowdown in the B2C business resulted in part from delays in
> launching new products and features, as well as a decline in conversion rates.

87.     The press release also reported that gross profit and gross margin had been negatively impacted in the quarter:

> Gross profit was $14.2 million in the third quarter, compared to $15.1 million in the prior-year quarter. Gross margin was 54% compared to 70% a year ago. This decline was due to the increase in the reserve for credit losses on receivables, revenue mix shift towards B2B, and continued investment in W2 therapist network.

88.     On the same day, Talkspace filed with the SEC a Quarterly Report on Form 10-Q (the "3Q21 10-Q"). In the 3Q21 10-Q, the Company confirmed that the disappointing third quarter financial results were tied to an increased allowance for credit losses on accounts receivables:

> *Accounts Receivable and Allowance for Credit Losses*
>
> Accounts receivables are recorded at the invoiced amount and amounts for which revenue has been recognized but not invoiced, net of allowance for credit loss. The allowance for credit loss is based on the Company's assessment of historical collection experience, customer creditworthiness, current and future economic conditions and market conditions. The Company reviews the adequacy of the allowance for credit loss based on a combination of factors, including an assessment of the current customer's aging balance, the nature and size of the customer, the financial condition of the customer, and the amount of any receivables in dispute. Accounts receivable deemed uncollectable are charged against the allowance for credit loss when identified. ***As of September 30, 2021, the allowance for credit losses mainly related to receivables from the Company's health plan customers***.
>
> During the three months ended September 30, 2021, the Company recorded an increase in the allowance for credit losses of $3.4 million, with approximately 84% of this amount related to aged balances over 90 days outstanding. ***During the nine months ended September 30, 2021, the Company recorded an increase in the allowance for credit losses of $3.6 million, with approximately 27% of this amount related to aged balances prior to 2021***.

89.     The increase in the allowance for credit losses was more than 10% of the Company's revenue for the quarter.  The 2Q21 10-Q shows that the Directors were aware of this risk: "[C]hallenging economic conditions may impair the ability of our clients to pay for the software-based products and services they already have purchased from us and, as a result, ***our write-offs of accounts receivable could increase***."

90.     On November 15, 2021, Talkspace held a conference call with financial analysts. In his prepared remarks, Defendant Braunstein acknowledged that "the overall financial results for the third quarter came in below expectations management shared with investors on our last earnings call. We are obviously disappointed by this performance, and we have to do better."

91.     Following the disclosure of the third quarter financial results, Talkspace stock dropped $1.23 per share, or 36.38%, to close at $2.16 per share on November 16, 2021.

92.     On February 22, 2022, Talkspace filed with the SEC a Current Report on Form 8-K attaching a press release disclosing that the Company would fall short of its revenue guidance for 2021, with revenue of $114 million, representing a 15% decrease from the Company's previous revenue guidance.

**F.      Talkspace Discloses The Departure Of Key Officers**

93.      On November 18, 2021, Talkspace filed with the SEC a Current Report on Form 8-K attaching a press release which Talkspace issued on November 15, 2021, disclosing the resignations of Oren Frank and Roni Frank. The 8-K also disclosed that Oren Frank and Roni Frank would "continue to provide strategic advisory services to the Board for a period of six months to assist the Company with the orderly transition of their respective duties." Talkspace agreed to pay Oren Frank and Roni Frank each $125,000 at the end of six months for their "strategic advisory services."

94.     The 8-K detailed the terms of Oren Frank's and Roni Frank's separations, which included severance benefits, a separation payment of $750,000, and accelerating vesting of stock options:

> Mr. Frank and Ms. Frank will each receive the severance benefits provided for under the Company's Executive Severance Plan (except that, rather than receiving 12 and 6 months of COBRA reimbursement payments, respectively, Mr. and Ms.

27

Frank will each receive 24 months of COBRA reimbursement payments). In addition, the Company will pay $750,000 to each of Mr. and Ms. Frank as an additional separation payment in recognition of their contributions to the Company as founders and as additional consideration for their continued compliance with their restrictive covenants. All stock options held by Mr. Frank and Ms. Frank that were granted prior to the business combination will accelerate vesting and will remain exercisable until June 1, 2024, and all stock options granted following the business combination will be cancelled and forfeited. The vesting of restricted stock units granted after the business combination that would have otherwise vested through June 1, 2024 will be accelerated and the remainder will be cancelled and forfeited.

95.     In a press release attached to the 8-K, Oren Frank admitted that he and Roni Frank lacked the skills necessary to run a public company such as Talkspace, calling himself and Roni Frank "entrepreneurs" and stating that he was certain that the Company would flourish under "**new leadership, one that is suited for the different set of needs and skills required for a publicly traded company,**" even though their leadership qualities had been repeatedly touted by the Company in its public filings.

96.     In the third quarter conference call with investors and financial analysts, Defendant Braunstein confirmed that Oren Frank resigned because he was not qualified for the position and that succession discussions began around the time the Company went public:

Stephanie Davis (SVB Leerink):

[A] CEO transition is a pretty big move at the stage in a company's lifetime. So, I was wondering, Doug, if you could tell us more about what you would be looking for in a new CEO, just kind of on a list of goals or priorities, or maybe what they're focused could be?

Doug Braunstein:

Okay. So thanks for that question, Stephanie. I'm going to actually just step back for a second, because I think it's important for you to put that question in context, which is, **we did not get started as a public company in the manner that we had hoped for.** And obviously we're disappointed by that. **And our Board has been working together with the management really over the past five months. And we've had actually numerous conversations regarding management and management succession.** And collectively with Oren, we decided to make a

change here. And obviously, as you can see from the press releases that came out,
Oren agreed that this was the right decision at the right time.

97.     On November 22, 2021, Talkspace disclosed that Hirschhorn was resigning under

troubling circumstances.  According to a cryptic Company press release, the resignation followed

"an internal review of Hirschhorn's conduct in connection with a company offsite that took place

[the prior] week."

**G.      The Individual Defendants Ignored Red Flags Pointing To A Lack Of
         Internal Controls And Poor Leadership**

98.     Talkspace suffered from a lack of internal controls over financial reporting and poor

leadership.

99.     On May 5, 2021, HEIC filed with the SEC a Current Report on Form 8-K. The 8-

K disclosed that on April 12, 2021, the SEC released a public statement relating to the

misclassification of warrants issued to special purpose acquisition companies as components of

equity instead of as liabilities.

100.     According to the 8-K, HEIC's management evaluated the relevant warrants and

"the forward purchase agreement under Accounting Standards Codification Subtopic 815-40,

*Contracts in Entity's Own Equity*." HEIC's management concluded that the warrants and the

forward purchase agreement were erroneously presented as equity as opposed to liabilities on

HEIC's balance sheet. This error required a restatement of the financial statements reported in

HEIC's Quarterly Reports filed with the SEC on August 14, 2020, for the period ended June 30,

2020, and on November 16, 2020 for the period ended September 30, 2020; and the 2020 10-K, as

well as its financial data as of June 11, 2020.

101.     Consequently, HEIC filed with the SEC an amended Annual Report on Form 10-

K/A on May 5, 2021, including the restated financial statements.

102.    Further, in connection with the restatement, HEIC's management reassessed the effectiveness of its disclosure controls and procedures and determined that they were ineffective.

103.    The Merger Proxy Statement disclosed that the material weakness in internal control over financial reporting was ongoing and identified the consequences of the weakness including an inability "to report our financial results on a timely and accurate basis," investor ignorance of HEIC's operations, possible sanctions, investigations, judgments, legal claims and penalties, an impaired ability to acquire capital, and a stock price drop.

104.    In an amendment to a Current Report on Form 8-K/A signed by Hirschhorn and filed with the SEC on June 23, 2021 – the first operational day of merged Talkspace – the Company announced the dismissal of WithumSmith+Brown PC ("Withum"), Talkspace's independent registered public accounting firm and the engagement of a new independent auditor because of a failure in internal controls:

> On June 22, 2021, the audit committee of Talkspace's board of directors dismissed [Withum], HEC's independent registered public accounting firm prior to the Business Combination, as Talkspace's independent registered public accounting firm.

> The report of Withum on HEC's balance sheet as of December 31, 2020 and the statements of operations, changes in stockholders' equity and cash flows for the period from February 6, 2020 (inception) to December 31, 2020, which included an explanatory paragraph as to the Company's ability to continue as a going concern, did not contain an adverse opinion or a disclaimer of opinion, and were not qualified or modified as to uncertainties, audit scope or accounting principles.

105.    In the 2Q21 10-Q, the Company went into further detail about the misclassification of the warrants and Forward Purchase Agreement, the discovery of the material weaknesses in internal controls, and the potential impact on the Company:

> As a result of such material weakness, the restatement, the change in accounting for the warrants and HEC Forward Purchase Agreement, and other matters raised or that may in the future be raised by the SEC, we may face potential litigation or other disputes, which may include, among others, claims invoking the federal and

state securities laws, contractual claims or other claims arising from the restatement and material weaknesses in our internal control over financial reporting and the preparation of our financial statements…Any such litigation or dispute, whether successful or not, could have a material adverse effect on our business, results of operations and financial condition.

***We cannot assure you that there will not be additional material weaknesses in our internal control over financial reporting now or in the future. Any failure to maintain internal control over financial reporting could severely inhibit our ability to accurately report our financial condition, results of operations or cash flows.*** If we are unable to conclude that our internal control over financial reporting is effective, or if our independent registered public accounting firm determines that we have a material weakness in our internal control over financial reporting, investors may lose confidence in the accuracy and completeness of our financial reports, the market price of our securities could decline, and we could be subject to sanctions or investigations by Nasdaq, the SEC or other regulatory authorities. Failure to remedy any material weakness in our internal control over financial reporting, or to implement or maintain other effective control systems required of public companies, could also restrict our future access to the capital markets.

106.    In its 2Q21 10-Q, Talkspace further admitted that, as of the end of the second quarter, material weaknesses relating to the internal controls over financial reporting had not been fully addressed, stating:

Our management, with the participation of our principal executive officer and principal financial officer, evaluated, as of the end of the period covered by this Quarterly Report on Form 10-Q, the effectiveness of our disclosure controls and procedures (as that term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act). Based on that evaluation, ***our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were not effective as of June 30, 2021, due to the material weaknesses in our internal control over financial reporting described below***.

107.    The 2021 10-K revealed that Talkspace's management was unable to assess the Company's internal controls:

[M]anagement was unable, without incurring unreasonable effort or expense, to complete an assessment of our internal control over financial reporting as of December 31, 2021. Accordingly, we are excluding management's report on internal control over financial reporting pursuant to Section 215.02 of the SEC Division of Corporation Finance's Regulation S-K Compliance & Disclosure Interpretations. As a result, this Annual Report on Form 10-K also does not include an attestation report of our independent registered accounting firm.

31

108.    The 2021 10-K further disclosed that, on November 26, 2021, the Financial Industry Regulatory Authority ("FINRA") had conducted a review of the trading of the Company's stock in response to the Company's third quarter financial results and the resignation of Oren Frank and Roni Frank. The Company provided answers and documents in response to the FINRA investigation on December 9, 2021.

109.    The Company's hiring of Hirschhorn as its President and COO demonstrates the leadership vacuum at Talkspace, since Hirschhorn had, only a few years prior to his retention by Talkspace, been forced to resign from a high-ranking position with a publicly traded company in a cloud of scandal.  On December 5, 2018, the Southern Investigative Reporting Foundation ("SIRF") released a report that detailed Hirschhorn's improper sexual relationship with a subordinate.

110.    According to the SIRF report, for over two years, Hirschhorn had an affair with a subordinate, who received promotions "over colleagues with either more industry experience or better credentials," resulting in increased compensation and benefits. Hirschorn also was reported to have engaged in insider trading with the employee, advising her "when he thought there were good opportunities to sell [her] shares." After a number of colleagues complained to management, the employee's superior drafted a report of the allegations and submitted it to Teladoc's legal and human resources departments.

111.    The contents of the SIRF report were widely disseminated and even formed the basis of a class action lawsuit against Teladoc, Hirschhorn, and Teladoc CEO Jason Gorevic. An outside law firm hired by Teladoc's legal department confirmed the veracity of the contents of the SIRF report.

112.     As a result of his improper and unethical conduct, Hirschhorn was forced to resign from Teladoc in December 2018 but not before the employee who revealed the affair and accompanying insider trading was fired.

113.     Notwithstanding his disgraceful departure from Teladoc, Hirschhorn was hired by Talkspace in February 2020, and the Board approved substantial compensation for him, as well as substantial supervisory authority.

114.     Even though Hirschhorn was forced to resign from Teladoc due to misconduct, this fact was not disclosed by the Company before or after the Merger. In fact, as it did with Oren Frank and Roni Frank, the company touted Hirschhorn's leadership.

### H.     Talkspace Is Sued in Securities Class Action Lawsuits

115.     In January 2022, securities class actions captioned *Baron v. Talkspace, Inc., et al.*, 1:22-cv-00163-PGG (S.D.N.Y.), and *Valdez v. Talkspace, Inc., et al.*, 1:22-cv-00840-PGG (S.D.N.Y.), were filed against Talkspace on January 7 and January 31, respectively.  Both lawsuits named the Company, Oren Frank, and Defendant Braunstein, among others, as defendants.

116.     Baron alleges violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a), and SEC Rule 14a-9, 17 C.F.R. §240.14a-91, promulgated thereunder and seeks damages on behalf of a class of holders of Talkspace common stock who purchased or otherwise acquired Talkspace common stock before the May 19, 2021 record date for the special meeting of shareholders held on June 17, 2021 to consider approval of the Merger and were entitled to vote on the Merger.

117.     Baron alleges that the named defendants misrepresented Talkspace's business, financials, and prospects, by omitting, *inter alia*, that: (a) Talkspace was experiencing significantly increased online advertising costs in its B2C business since the start of 2021; (b) Talkspace was

experiencing lower conversion rates in its online advertising in its B2C business; (c) Talkspace was experiencing increased customer acquisition costs and more tepid B2C demand than represented to investors; (d) Talkspace was suffering from ballooning customer acquisition costs and worsening growth and gross margin trends; (e) Talkspace had overvalued its accounts receivables from certain of its health plan clients in its B2B business, which amounts required adjustment downward; and (f) as a result of (a)-(e) above, Talkspace's 2021 financial guidance was not achievable and lacked any reasonable basis.

118.    Valdez seeks damages on behalf of a class consisting of (a) all persons or entities that purchased or otherwise acquired Talkspace securities between June 11, 2020 and November 15, 2021, inclusive, and/or (b) all holders of Talkspace common stock as of the May 19, 2021 record date for the special meeting of shareholders held on June 17, 2021 to consider approval of the Merger and entitled to vote on the Merger. Valdez alleges violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act and 15 U.S.C. §§78n(a) and 78t(a), and SEC Rule 14a-9, 17 C.F.R. §240.14a-91, promulgated thereunder.

119.    Valdez alleges that the named defendants made false and/or misleading statements and/or failed to disclose that: (i) HEIC had overstated its competitive advantage and due diligence capabilities with respect to identifying and effectuating a merger with target companies; (ii) HEIC had conducted inadequate due diligence into then private, pre-Merger Talkspace, or else ignored and/or failed to disclose multiple red flags concerning then-private, pre-Merger Talkspace's business and operations; (iii) Talkspace was experiencing significantly increased online advertising costs in its B2C business since the beginning of 2021; (iv) Talkspace was experiencing lower conversion rates in its online advertising in its B2C business; (v) as a result of (iii) and (iv) above, Talkspace was experiencing increased customer acquisition costs and more tepid B2C

demand than represented to investors; (vi) as a result of (iii)-(v) above, Talkspace was suffering from ballooning customer acquisition costs and worsening growth and gross margin trends; (vii) Talkspace had overvalued its accounts receivables from certain of its health plan clients in its B2B business, which amounts required adjustment downward; and (viii) as a result of (iii)-(vii) above, Talkspace's 2021 financial guidance was not achievable and lacked any reasonable basis in fact.

120.    On June 3, 2022, the Baron and Valdez actions were consolidated under the caption *In Re Talkspace, Inc. Securities Litigation*, No. 22 Civ. 163 (PGG) (S.D.N.Y.) (the ("Securities Class Action").

### I.    Talkspace Insiders Cash Out Their Interests In A Stock Offering

121.    On July 11, 2022, Talkspace filed with the SEC a Prospectus on Form 424B3 announcing an offering of 77,096,102 shares of Talkspace common stock, 12,780,000 warrants to purchase shares of Talkspace's common stock, and 33,480,000 shares of common stock underlying warrants of Talkspace common stock (the "July Offering").

122.    In the July Offering, numerous Talkspace founders, investors, and directors look to cash out a substantial portion, if not all, of their Talkspace common stock holdings.  According to the Prospectus for the July Offering, Qumra Capital II, LP, controlled by Defendant Shachar, is selling its entire holding of 8,573,437 Talkspace common shares.   Norwest   Venture   Partners XIII, LP, controlled by Defendant Crowe, is selling its entire holding of 14,702,972 Talkspace common shares in the offering.  Defendants Braunstein likewise is cashing in a substantial portion of his holdings, selling 1,273,690 shares and 1,271,200 warrants in the offering.

123.    HEC Master Fund LP, controlled by Defendant Braunstein, is selling 10,150,000 Talkspace common shares and 7,640,000 warrants, the majority of its Talkspace holdings,  in the offering.

124.   The Braunstein 2015 Trust, of which Samara Braunstein is the trustee, is selling its entire holding of 1,000,756 Talkspace common shares and 998,800 warrants in the offering.

## VI.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

125.   Plaintiff brings this action derivatively and for the benefit of Talkspace to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties, and violations of Section 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

126.   Talkspace is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

127.   Plaintiff is, and has been at all relevant times, a stockholder of Talkspace and was a stockholder of the Company at the time of the transactions alleged herein.  Plaintiff will adequately and fairly represent the interests of Talkspace in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

128.   Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused.  The Board is neither disinterested nor independent.

### A.   Demand on Defendant Braunstein Is Excused

129.   As admitted by Talkspace in its public filings, Defendant Braunstein is the Company's Interim CEO and Chairman of the Board and serves as Founder and Managing Partner of Hudson Executive Capital, an affiliate of the HEC Sponsor, and therefore is not independent. Indeed, Talkspace's 2021 10-K does not list Braunstein as an independent director.

130.   As an employee of Talkspace, the Company provides Defendant Braunstein with his principal occupation from which he receives substantial compensation, including $398,628 in

compensation in fiscal year 2021 alone.  Thus, Braunstein could not consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.

131.    Further, Sarah Braunstein, Defendant Braunstein's wife is Talkspace's Chief Marketing Officer and received $6,254,908 in 2021 alone in compensation. Therefore, Defendant Braunstein cannot consider a demand which would jeopardize the receipt of this substantial compensation and that may require that his wife's conduct be investigated, and that legal action be taken if misconduct is discovered.

132.    Braunstein will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  According to the 2021 10-K, Braunstein holds 23,525,046 shares of common stock, representing 11.7% of the Company's voting power.[15] Further, in a Current Report on Form 8-K filed with the SEC on May 11, 2002, Talkspace reported the approval of an equity award to Braunstein pursuant to the Company's 2021 Incentive Award Plan:

> The Award is composed of (i) a non-qualified stock option to purchase 640,000 shares of the Company's common stock...and (ii) a restricted stock unit award with respect to 1,650,000 shares of the Company's Common Stock. The Award shall vest and become exercisable (as applicable) with respect to 50% of the underlying shares on May 15, 2022, and, with respect to the remaining 50% of the underlying shares, in six equal monthly installments on each of the first six monthly anniversaries of May 15, 2022 (such that the Award shall be fully vested on November 15, 2022), subject to...Braunstein's continued service as interim CEO through the applicable vesting date. Additionally, in the event of a Change in

---

[15]    This amount consists of (i) 11,340,600 shares of common stock and 7,640,000 shares of common stock issuable upon the exercise of warrants held by HEC Master Fund LP, (ii) 2,274,446 shares of common stock owned jointly among Defendant Braunstein and Talkspace's Chief Marketing Officer, non-party Samara Braunstein, who is Defendant Bernstein's spouse, including through a trust, and (iii) 2,270,000 shares of common stock beneficially owned jointly among Defendant Braunstein and Samara Braunstein through the ownership of warrants exercisable within 60 days of the date of February 15, 2022.

> Control (as defined in the Plan) prior to November 15, 2022, any unvested portion of the Award will accelerate and vest in full, subject to…Braunstein's continued status as interim CEO until immediately prior to the occurrence of such Change in Control.

If Braunstein acknowledged that he, Talkspace, or others engaged in misconduct, his investment in Talkspace would be substantially devalued and lucrative position jeopardized.

133.    Braunstein and HEC Master Fund LP[16] are named as defendants in the consolidated Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

134.    Defendant Braunstein, his spouse, and related entities are selling approximately 12,424,446 Talkspace common shares and 9,910,000 warrants in the July Offering. Therefore, Braunstein is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest because it would jeopardize his ability to sell the shares, or the price at which he sells the shares in the upcoming July Offering.

135.    Braunstein, as a director of Talkspace, was required to, but failed to: (1) implement and maintain an effective system of internal controls to effectively oversee the material risks facing the Company, oversee Talkspace's core operations, and ensure that the Company' statements regarding its financial condition, operations, business prospects, and personnel were truthful, complete and accurate; and (2) investigate and take action when presented with red flags of misconduct.  Had Braunstein taken timely action, the damage to Talkspace described herein could have been prevented or, at least, minimized.

---

[16] HEC Master Fund LP is a hedge fund operated by Hudson Executive Capital and has approximately $436 million in assets.

136.    Braunstein is neither disinterested nor independent.  Any demand upon Defendant Braunstein is futile and, thus, excused.

**B.    Demand On Defendant Berg Is Excused**

137.    Since January 2022, Berg has been the President of U.S. Government Business and Senior Advisor Leading Medicare Advantage and Individual & Family Plans at Cigna Corporation. Berg also joined Cigna's Enterprise Leadership Team, which works closely with Cigna's Chairman and CEO. Cigna and Talkspace have an ongoing partnership since May 2020, when Cigna added Talkspace to its behavioral provider network so that customers have the option of connecting with a therapist through either text, voice or video.[17] Further, Cigna is one of the primary insurance providers that provides coverage for Talkspace's services.[18]  The Company failed to disclose the connection between Berg and Cigna on its website and in its press releases. As the representative of a business partner of Talkspace, there is reasonable doubt that Berg could consider a demand in a disinterested and independent manner. Indeed, Talkspace's 2021 10-K does not list Berg as an independent director.

138.    Defendant Berg received $398,628 in compensation in the form of fees and stock and option awards for his service as a director in 2021. Berg earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a

[17]    Steven Loeb, Cigna Adds Talkspace to Provide Members With Text-Based Therapy, *Vator News*, May 21, 2020, https://vator.tv/news/2020-05-21-cigna-adds-talkspace-to-provide-members-with-text-based-therapy

[18] Talkspace, August 10, 2020, https://www.talkspace.com/blog/talkspace-insurance-coverage/.

small cap company like Talkspace[19] is $186,000, so Berg received more than double the compensation of a director at a comparably capitalized company. If Berg acknowledged that he, Talkspace, or others engaged in misconduct, his lucrative position would be jeopardized. Further, if Berg acknowledged that executives at Talkspace had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director, either knew of the wrongdoing or should have known of the wrongdoing alleged herein.

139.    Berg, as a director of Talkspace, was required to, but failed to: (1) implement and maintain an effective system of internal controls to effectively oversee the material risks facing the Company, oversee Talkspace's core operations, and ensure that the Company' statements regarding its financial condition, operations, business prospects, and personnel were truthful, complete and accurate; and (2) investigate and take action when presented with red flags of misconduct. Had Berg taken timely action, the damage to Talkspace described herein could have been prevented or, at least, minimized.

140.    Berg is neither disinterested nor independent. Any demand upon Defendant Berg is futile and, thus, excused.

### C.    Demand on Defendant Crowe Is Excused

141.    As of February 25, 2022, Crowe beneficially owned 14,702,972 Talkspace shares, with a total voting power of 9.6%. If Crowe acknowledged that he, Talkspace, or others engaged in misconduct, his investment in Talkspace would be substantially devalued and his lucrative position would be jeopardized. Further, if Crowe acknowledged that executives at Talkspace had

---

[19]    The FW Cook survey defines a small cap company as one with a market capitalization of $2 billion or less with a median market capitalization of $646 million.

engaged in the wrongdoing alleged, he would be acknowledging that he, as a director, either knew of the wrongdoing or should have known of the wrongdoing.

142.    In 2017, Talkspace closed a $31 million financing round led by Qumra Capital with the participation of existing investors including Norwest Venture Partners, which is managed by Crowe.[20] Crowe, as the managing partner of Norwest, has share voting and dispositive power over Norwest's 9.6% stake in the Company. If Crowe acknowledged that he, Talkspace, or others engaged in misconduct, Norwest's investment in Talkspace would be devalued, it would undermine Crowe's and Norwest's credibility, and weaken their ability to attract future business.

143.    Norwest Venture Partners XIII, LP is selling 14,702,972 Talkspace common shares in the July Offering and Crowe shares voting and dispositive power over those shares. Therefore, Crowe is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest because it would jeopardize his ability to sell the shares, or the price at which he sells the shares in the upcoming July Offering.

144.    Crowe, as a director of Talkspace, was required to, but failed to: (1) implement and maintain an effective system of internal controls to effectively oversee the material risks facing the Company, oversee Talkspace's core operations, and ensure that the Company' statements regarding its financial condition, operations, business prospects, and personnel were truthful, complete and accurate; and (2) investigate and take action when presented with red flags of misconduct.  Had Crowe taken timely action, the damage to Talkspace described herein could have been prevented or, at least, minimized.

---

[20]    Globes, Sept. 6, 2017, https://en.globes.co.il/en/article-online-therapy-co-talkspace-raises-31m-1001204153

145.     As a member of the Audit Committee, Crowe had duties regarding oversight of the risks facing the Company and Talkspace's compliance with relevant laws, rules, and regulations. Crowe utterly failed to perform these essential duties.

146.     As a member of the Compensation Committee, Crowe was and is required by the Company's Charter to assist the Board in fulfilling its responsibilities relating to the compensation of executives and directors.  Crowe utterly failed to perform these essential duties.

147.     Crowe is neither disinterested nor independent. Any demand upon Defendant Crowe is futile and, thus, excused.

**D.     Demand on Defendant Shachar Is Excused**

148.     According to the 2021 10-K, Shachar held 8,753,437 shares of Talkspace common stock. If Shachar acknowledged that he, Talkspace, or others engaged in misconduct, his investment in Talkspace would be substantially devalued.  Further, if Shachar acknowledged that executives at Talkspace had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director, either knew of the wrongdoing or should have known of the wrongdoing.

149.     Shachar has a long-standing business and personal relationship with the Franks which precludes him from acting in an independent and disinterested manner. Defendant Shachar was a social friend of Defendants Oren Frank and Roni Frank before Shachar decided to invest in Talkspace:

> I was introduced [to the Franks] through Adam Singolda, a mutual friend of ours, and the rockstar CEO of Taboola (one of [Qumra Capital's] earlier portfolio companies) . In this first meeting with Oren and Roni, I loved the concept, and admired their courage to start a very risky new startup in the middle of their life, with two girls, far from home in the US.
>
> ***
>
> During this time, I got to see Oren and Roni, mostly in social occasions, and I became ***more enamored with this incredible couple***, and the truly exceptional

company they were building, but it was still too early for our new late stage fund. Three years after founding Talkspace, in 2015, the business finally started to take off. Talkspace pivoted from a group therapy, live-video conference model, to a subscription-based, text therapy model, and the business started to show real signs of growth. So, when by the end of 2017, Roni and Oren started raising round C, and we just closed our second late-stage venture fund, Qumra II, I immediately started working on the deal, and in perfect timing, the deal was closed by year end.

I read a lot of "Why We Invested" posts, and although there is total consensus in the venture market that we invest primarily in people, the "Why We Invested" posts almost always focus on the business, and not the people. I felt I had to dedicate the beginning of the post to the real reason why we invested in Talkspace. Below please find a description of the tremendous business that Oren and Roni built...

Shachar described his close connection with the Franks in an interview stressing that his "acquaintance with Roni and Oren in 2012, was initially social. We met at a BBQ in their home in Tenafly, New Jersey and *immediately bonded*, partially over shared difficulties of starting a new business."[21]

150.    In 2017, Talkspace closed a $31 million financing round led by Qumra Capital.[22] Shachar, as the managing partner of Qumra Capital, has share voting and dispositive power over Qumra Capital's 5.6% stake in the Company. If Shachar acknowledged that he, Talkspace, or others engaged in misconduct, Qumra Capital's investment in Talkspace would be devalued, it would undermine Shachar's and Qumra Capital's credibility, and weaken their ability to attract future business.

151.    Qumra Capital II, LP is selling 8,573,437 Talkspace common shares in the offering and Shachar jointly controls voting and dispositive power over those shares. Therefore, Shachar is incapable of considering a demand to commence and vigorously prosecute this action with the

---

[21]    Talkspace IPO: *When doing good does so well,* *CTECH*,https://www.calcalistech.com/ctech/articles/0,7340,L-3911742,00.html

[22]    Globes, Sept. 6, 2017, https://en.globes.co.il/en/article-online-therapy-co-talkspace-raises-31m-1001204153

required independence and disinterest because it would jeopardize his ability to sell the shares, or the price at which he sells the shares in the upcoming July Offering..

152.     Shachar, as a director of Talkspace, was required to, but failed to: (1) implement and maintain an effective system of internal controls to effectively oversee the material risks facing the Company, oversee Talkspace's core operations, and ensure that the Company' statements regarding its financial condition, operations, business prospects, and personnel were truthful, complete and accurate; and (2) investigate and take action when presented with red flags of misconduct.  Had Shachar taken timely action, the damage to Talkspace described herein could have been prevented or, at least, minimized.

153.     Shachar failed to uphold his additional obligations as a member of the Nominating and Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

154.     As a member of the Compensation Committee, Shachar was and is required by the Company's Charter to assist the Board in fulfilling its responsibilities relating to the compensation of executives and directors.  Shachar utterly failed to perform these essential duties.

155.     Shachar is neither disinterested nor independent.  Any demand upon Defendant Shachar is futile and, thus, excused.

### E.     Demand on Defendant Pawar Is Excused

156.     Defendant Pawar received $398,628 in compensation in the form of fees and stock and option awards for his service as a director in 2021.  Pawar earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a small cap company like Talkspace is $186,000, so Pawar received more than double the

compensation of a director at a comparably capitalized company. If Pawar acknowledged that he, Talkspace, or others engaged in misconduct, his lucrative position would be jeopardized. Further, if Pawar acknowledged that executives at Talkspace had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director, either knew of the wrongdoing or should have known of the wrongdoing alleged herein.

157.    Pawar, as a director of Talkspace, was required to, but failed to: (1) implement and maintain an effective system of internal controls to effectively oversee the material risks facing the Company, oversee Talkspace's core operations, and ensure that the Company' statements regarding its financial condition, operations, business prospects, and personnel were truthful, complete and accurate; and (2) investigate and take action when presented with red flags of misconduct. Had Pawar taken timely action, the damage to Talkspace described herein could have been prevented or, at least, minimized.

158.    As a member of the Audit Committee, Pawar had duties regarding oversight of the risks facing the Company and Talkspace's compliance with relevant laws, rules, and regulations. Pawar utterly failed to perform these essential duties.

159.    Pawar is neither disinterested nor independent. Any demand upon Defendant Pawar is futile and, thus, excused.

**F.    Demand on Defendant Warfield Is Excused**

160.    Defendant Warfield received $409,128 in compensation in the form of fees and stock and option awards for his service as a director in 2021. Warfield earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a small cap company like Talkspace is $186,000, so Warfield received more than double

45

the compensation of a director at a comparably capitalized company. If Warfield acknowledged that he, Talkspace, or others engaged in misconduct, his lucrative position would be jeopardized. Further, if Warfield acknowledged that executives at Talkspace had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director, either knew of the wrongdoing or should have known of the wrongdoing alleged herein.

161.    Warfield, as a director of Talkspace, was required to, but failed to: (1) implement and maintain an effective system of internal controls to effectively oversee the material risks facing the Company, oversee Talkspace's core operations, and ensure that the Company' statements regarding its financial condition, operations, business prospects, and personnel were truthful, complete and accurate; and (2) investigate and take action when presented with red flags of misconduct. Had Warfield taken timely action, the damage to Talkspace described herein could have been prevented or, at least, minimized.

162.    As a member of the Audit Committee, Warfield had duties regarding oversight of the risks facing the Company and Talkspace's compliance with relevant laws, rules, and regulations. Warfield utterly failed to perform these essential duties.

163.    As a member of the Compensation Committee, Warfield was and is required by the Company's Charter to assist the Board in fulfilling its responsibilities relating to the compensation of executives and directors. Warfield utterly failed to perform these essential duties.

164.    Warfield is neither disinterested nor independent. Any demand upon Defendant Warfield is futile and, thus, excused.

### G.    Demand on Defendant Yeaney Is Excused

165.    Defendant Yeaney received $398,628 in compensation in the form of fees and stock and option awards for his service as a director in 2021. Yeaney earns compensation far in excess

of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a small cap company like Talkspace is $186,000, so Yeaney received more than double the compensation of a director at a  comparably capitalized company. If Yeaney acknowledged that she, Talkspace, or others engaged in misconduct, her lucrative position would be jeopardized. Further, if Yeaney acknowledged that executives at Talkspace had engaged in the wrongdoing alleged, she would be acknowledging that she, as a director, either knew of the wrongdoing or should have known of the wrongdoing alleged herein.

166.    Yeaney, as a director of Talkspace, was required to, but failed to: (1) implement and maintain an effective system of internal controls to effectively oversee the material risks facing the Company, oversee Talkspace's core operations, and ensure that the Company' statements regarding its financial condition, operations, business prospects, and personnel were truthful, complete and accurate; and (2) investigate and take action when presented with red flags of misconduct.  Had Yeaney taken timely action, the damage to Talkspace described herein could have been prevented or, at least, minimized.

167.    As a member of the Audit Committee, Yeaney had duties regarding oversight of the risks facing the Company and Talkspace's compliance with relevant laws, rules, and regulations.  Yeaney utterly failed to perform these essential duties.

168.    Yeaney failed to uphold her additional obligations as Chair of the Nominating and Governance Committee, which include, inter alia, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

169.    Yeaney is neither disinterested nor independent.  Any demand upon Defendant Yeaney is futile and, thus, excused.

### H.    Other Factors Demonstrating That Demand Upon The Individual Defendants Is Excused

170.    Talkspace has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

171.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

172.    Publicly traded companies, such as Talkspace, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Talkspace's damages.

## VII.    CLAIMS FOR RELIEF

### COUNT I

**(Against the Individual Defendants for Violations of § 20(a) of the Exchange Act)**

173.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

174.    Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable."

175.    The Individual Defendants, by virtue of their positions with Talkspace and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Talkspace and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act.  The Individual Defendants had the power and influence, and exercised same, to cause Talkspace to engage in the illegal conduct and practices complained of herein.

176.    The misleading information contained in the Merger Proxy Statement constitutes material misstatements and omissions which have damaged the Company.  As controlling persons, the Individual Defendants are liable for the primary violations and Plaintiff, on behalf of Talkspace, seeks relief for damages inflicted upon the Company based on the misleading Merger Proxy Statement.

## COUNT II

### (Breach of Fiduciary Duties Against the Individual Defendants)

177.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

178.    The Individual Defendants owed and owe fiduciary duties to Talkspace.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Talkspace the highest obligation of good faith and loyalty in the administration of Talkspace's affairs, including assuring that Talkspace complied with state and federal laws governing, among other things, the making of truthful, complete and accurate public statements regarding the Company's financial condition and business prospects and intellectual property rights.  The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and

principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Talkspace alleged herein.

179.   The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

180.   The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties regarding prudently managing the business of Talkspace in a manner consistent with the duties imposed upon them by law.

181.   By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Talkspace's affairs and in the use and preservation of Talkspace's assets.

182.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Talkspace has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  Such damages include, among other things, the costs of defending and resolving the pending Securities Class Action.

183.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT III**

**(Derivatively Against All Defendants for Aiding and Abetting)**

184.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

185.   Each of the Defendants (other than nominal defendant Talkspace) acted and is acting with knowledge of or with disregard to the fact that the Defendants are in breach of their fiduciary duties to Talkspace and has participated in a conspiracy in breach of fiduciary duties.

186.   In committing the wrongful acts alleged herein, each of the Defendants has pursued, or joined in the pursuit of, a common course of conduct.  The Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

187.   The Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws, authorized corporate actions to serve their own personal interests rather than the interests of the Company and its shareholders, misrepresented material facts about the Company, its financial condition and business prospects, prevented the disclosure of material information necessary to make statements complete and accurate, and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

188.   The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

189.   Each of the Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

190.   Each of the Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Defendants acted with knowledge of the primary

wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

## VIII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.      Declaring that the Plaintiff may maintain this action derivatively on behalf of Talkspace and that Plaintiff is an adequate representative;

B.      Declaring that the Defendants have breached their fiduciary duties to Talkspace, and/or aided and abetted the breach of their fiduciary duties as alleged herein;

C.      Awarding money damages against all Defendants, jointly and severally, for the losses and damages suffered as a result of the acts and transactions complained of herein.

D.      Directing Defendants, jointly and severally, to account for all losses and/or damages sustained by Talkspace by reason of the acts and omissions complained of herein;

E.      Requiring Defendants to remit to Talkspace all of their salaries and other compensation received for the periods when they breached their duties;

F.      Ordering equitable and/or injunctive relief as permitted by law, equity, and statutory provisions sued hereunder;

G.      Awarding pre-judgment and post-judgment interest as allowed by law;

H.      Awarding Plaintiff's attorneys' fees, expert fees, consultant fees, and other costs and expenses; and

I.      Granting such other and further relief as this Court may deem just and proper.

**IX.      JURY DEMAND**

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated:  July 22, 2022                                    **WEISS LAW**

                                    By:    s/ David C. Katz
                                            David C. Katz
                                            Mark Smilow
                                            Joshua M. Rubin
                                            305 Broadway, 7th Floor
                                            New York, NY  10007
                                            Telephone: (212) 682-3025
                                            Facsimile: (212) 682-3010
                                            Email: dkatz@weisslawllp.com
                                                    msmilow@weisslawllp.com
                                                    jrubin@weisslawllp.com

                                            *Attorneys for Plaintiff*